**AFFIDAVIT OF SPECIAL AGENT DOMINIC GROSS**
**IN SUPPORT OF A CRIMINAL COMPLAINT**

I, Dominic Gross, being duly sworn, state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.    I have been a Special Agent of the Federal Bureau of Investigation ("FBI") since 2015. I am currently assigned to the Economic Crimes Squad in the FBI's Boston Field Office, where I investigate possible violations of federal law, including wire fraud, bank fraud, money laundering, intellectual property rights violations, bankruptcy fraud, and mortgage fraud. I have received on-the-job training as well as FBI-sponsored training related to these types of investigations, and I have participated in the execution of search, seizure, and arrest warrants related to criminal investigations. My investigations and training have included the use of surveillance techniques, confidential informants, and court-authorized interception of wire and electronic communications.

2.    As an FBI Special Agent, I am empowered by law to investigate violations of the laws of the United States, and I am a law enforcement officer with authority to execute arrest and search warrants issued under authority of the United States.

3.    I am currently conducting an investigation of EMEKA ILOBA (also known as "Patrick") ("ILOBA"), EMELYN CLOUGH ("CLOUGH"), and others for violations of certain federal laws, including bank fraud, money laundering, and aggravated identity theft, in violation of Title 18, United States Code, Sections 1344, 1956, and 1028A, respectively.

4.    I make this affidavit in support of a criminal complaint charging ILOBA and CLOUGH with conspiracy to commit bank fraud, in violation of Title 18, United States Code, Section 1349. Specifically, as set forth below, I have probable cause to believe that ILOBA and CLOUGH conspired with each other and with others to execute a scheme to fraudulently obtain

money under the custody and control of Santander Bank, N.A. ("Santander Bank"), Bank of America, N.A. ("Bank of America"), and TD Bank, N.A. ("TD Bank"), all of which are financial institutions as defined in Title 18, United States Code, Section 20.

5.      The facts in this affidavit come from my personal observations and review of records, my training and experience, and information obtained from other agents, law enforcement officers, and witnesses. This affidavit is intended to show merely that there is probable cause for the requested criminal complaint and does not set forth all of my knowledge about this matter.

## PROBABLE CAUSE TO BELIEVE THAT A FEDERAL CRIME WAS COMMITTED BY ILOBA AND CLOUGH

6.      Based on my investigation – including my review of bank records, surveillance photos, and text messages, and information provided by cooperating witnesses and victims – I am aware that from at least in or about late 2016 or early 2017 and continuing through in or about March 2018, ILOBA and CLOUGH agreed with each other and with others to fraudulently obtain money from accounts held by bank customers – including customers of Santander Bank, Bank of America, and TD Bank – using fraudulent identification documents. ILOBA and CLOUGH further agreed to launder the proceeds of the fraud through accounts at other financial institutions in the names of fictitious business entities.

### Santander Bank Transactions (Uphams Corner Branch)

7.      Bank records and surveillance photos, as well as information provided by three cooperating witnesses (CW-1, CW-2, and CW-3)[1] and the victims set forth below, show that, as

---

[1] CW-1, CW-2, and CW-3 have all pleaded guilty in the United States District Court for the District of Massachusetts to the charge of conspiracy to commit bank fraud, in violation of Title 18, United States Code, Section 1349. CW-1 and CW-3 have also pleaded guilty to aggravated identity theft charges, in violation of Title 18, United States Code, Sections 1028A(a)(1) and 2. CW-1, CW-2, and CW-3 have each entered into a cooperation agreement with the government in the hope of obtaining leniency at sentencing. Information provided by CW-1,

part of the fraud scheme described herein, from in or about late 2016 or early 2017 through in or about April 2017, ILOBA agreed with others to fraudulently obtain money from trust accounts held by Victim 1 and Victim 2, both individual customers of Santander Bank, and launder the proceeds of the fraud through accounts at other financial institutions in the names of fictitious business entities.

8.      In or about late 2016 or early 2017, CW-1 asked CW-2, who at the time worked as a teller at a Santander Bank branch located in the Uphams Corner area of Dorchester, Massachusetts (the "Uphams Corner Branch"), to assist in conducting fraudulent withdrawals from the accounts of Santander Bank customers. CW-2 agreed to facilitate fraudulent transactions.

9.      Around the same time, CW-1 recruited CW-3 to launder the proceeds of the fraud scheme described herein. Specifically, CW-3's role in the scheme was to open bank accounts in the names of fictitious business entities using fraudulent identification documents, deposit fraudulently obtained funds into the accounts, and then withdraw cash. To facilitate this, CW-1 obtained a photo of CW-3 and sent it via WhatsApp[2] to another co-conspirator, CC-1, so that CC-1 could create fraudulent identification documents bearing CW-3's photo. CC-1 later mailed the fraudulent identification documents to ILOBA, who provided them to CW-1, who, in turn, provided them to CW-3.

---

CW-2, and CW-3 has been corroborated by, among other things, bank records and surveillance photos.

[2] Based on my training and experience, I am aware that WhatsApp is a multimedia messaging application operated on mobile devices that enables users to share and send one another text and voice messages, images, and documents, and to make voice and video calls. WhatsApp messages and communications are encrypted with end-to-end encryption which enables only the communicating users to read or listen to the communications. I am aware that WhatsApp and similar communication services are commonly used in connection with criminal activity because they aid in masking communications and generally prohibit law enforcement from accessing the communications without direct access to the user's phone.

10. In or about April 2017, ILOBA, CW-1, and CC-1 arranged for an unidentified co-conspirator, CC-2, to use fraudulent identification documents to conduct unauthorized withdrawals from Victim 1's and Victim 2's trust accounts at Santander Bank, with the assistance of CW-2.

11. On or about April 6, 2017, CC-2 entered the Uphams Corner Branch, approached CW-2, identified himself as one of the two trustees of Victim 1's irrevocable trust account, and presented CW-2 with a fraudulent identification document in the trustee's name. Bank records show that CC-2 requested two official bank checks – one for $140,000 and a second for $135,000 – drawn on Victim 1's irrevocable trust account, ending in 7994 ("SANT-7994"). CC-2 also requested a cash withdrawal of $9,650 from the SANT-7994 account. CW-2 facilitated the requested transactions, knowing that CC-2 was not, in fact, the trustee of Victim 1's account.

12. On or about April 7, 2017, CC-2 again entered the Uphams Corner Branch, approached CW-2, identified himself as one of the trustees of Victim 1's account, and presented CW-2 with a fraudulent identification document in the trustee's name. Bank records show that CC-2 requested a cash withdrawal of $9,800 from the SANT-7994 account. CW-2 facilitated the cash withdrawal, knowing that CC-2 was not, in fact, the trustee of Victim 1's account.

13. The second trustee of Victim 1's account was interviewed and confirmed that the transactions described above were fraudulent and that neither he, the trustee impersonated by CC-2, nor Victim 1 authorized anyone to access the account.

14. The two official bank checks referenced in paragraph 11 above were deposited into business bank accounts at other financial institutions, which accounts I believe were operated by other co-conspirators, and the funds were thereafter depleted from those accounts.

15. As part of the scheme, on or about April 26, 2017, CW-1 accompanied CW-3 to a TD Bank branch in West Roxbury, Massachusetts, where CW-3 opened two business checking

accounts, ending in 9642 ("TD-9642") and 9668 ("TD-9668"), in the name of a fictitious entity, IMS Intellibound Inc. ("IMS Intellibound"). Bank records show that CW-3 used the name, date of birth, and social security number of another individual, Victim 3, to open the accounts. Victim 3 was listed as IMS Intellibound's purported owner and the sole authorized signer on both accounts.

16.     On or about April 27, 2017, CC-2 again entered the Uphams Corner Branch and approached CW-2. On this occasion, CC-2 identified himself as Victim 2, another Santander Bank customer, and presented CW-2 with a fraudulent identification document in Victim 2's name. Bank records show that CC-2 requested two official bank checks – one for $175,500 and a second for $165,000 – drawn on Victim 2's revocable trust account, ending in 9180 ("SANT-9180"). The $175,500 check was made payable to IMS Intellibound. CC-2 also requested a cash withdrawal of $9,600 from the SANT-9180 account. CW-2 facilitated the requested transactions, knowing that CC-2 was not, in fact, Victim 2.

17.     Victim 2 was interviewed and confirmed that the transactions described above were fraudulent and that he did not authorize anyone to access his account.

18.     Based on information provided by CW-1, I am aware that CW-1 provided the $175,500 check to CW-3 to be deposited into one of the accounts CW-3 had opened at TD Bank in the name of IMS Intellibound. Bank records show that on or about the same day as the transactions described in paragraph 16 above (*i.e.*, April 27, 2017), the $175,500 check was deposited into the TD-9642 account at a TD Bank branch in the Central Square area of Cambridge, Massachusetts. Victim 3's name was written on the deposit ticket and signed on the back of the check.

19.     Thereafter, funds were electronically transferred from TD-9642 to the other account CW-3 had opened in the name of IMS Intellibound, TD-9668. CW-3 then went to three different

TD Bank branches and made the following cash withdrawals: one in the amount of $9,500 from

TD-9668, a second in the amount of $9,500 from TD-9642, and a third in the amount of $9,700

from TD-9668. CW-3 signed each of the three withdrawal tickets as Victim 3 and, in at least two

of these instances, used a fraudulent California driver's license in Victim 3's name to make the

withdrawals.

20.     Victim 3 was interviewed and confirmed that he has never had a California driver's

license, has never had personal or business accounts at TD Bank, and has never heard of IMS

Intellibound. Victim 3 further confirmed that he did not authorize bank accounts to be opened in

his name.

21.     In interviews with investigators, CW-2 acknowledged his knowing involvement in

the above-described scheme. CW-2 provided the following information:

a.   CW-2 met CW-1 in or about late 2016. At some point in the spring of 2017, CW-1

     told CW-2 that if CW-2 helped CW-1 withdraw funds from Santander Bank

     accounts, CW-1 would give CW-2 a portion of whatever CW-1 withdrew. CW-2

     told CW-1 that he was willing to help without getting paid to do so. CW-1 then

     asked CW-2 general questions about the mechanics for making withdrawals from

     Santander Bank accounts, including what forms of identification would be required.

b.   Approximately a month after this initial discussion, CW-1 contacted CW-2 to

     arrange a meeting. CW-2 met CW-1 in a parking lot, where CW-1 was in a car with

     three other individuals, including CC-2. These individuals explained to CW-2 the

     transactions they intended to conduct with CW-2's assistance that day. CC-2 had

     with him specific account numbers, identification cards, and withdrawal amounts.

     When CW-2 saw the identification cards, he knew they were fake. After CW-2

facilitated this first set of transactions, CW-1 gave CW-2 approximately $4,000 in cash.

    c. CW-2 assisted with a second set of transactions a couple of months later. The second set of transactions was conducted in the same manner as the first, although only CW-1 and CC-2 were present on this occasion. CW-1 again gave CW-2 approximately $4,000 in cash in exchange for facilitating the fraudulent withdrawals.

22. In interviews with investigators, CW-1 similarly acknowledged his knowing involvement in the scheme. CW-1 provided the following information:

    a. CW-1's friend, ILOBA, got him involved in the scheme. ILOBA introduced CW-1 to CC-1, who made fake IDS for CW-1 and ILOBA and provided them with business incorporation documentation so that they could open fake business bank accounts. CW-1 and ILOBA opened the accounts and used them to negotiate checks and withdraw funds for CC-1.

    b. Later, at CC-1's direction, CW-1 recruited CW-2 to facilitate fraudulent withdrawals from Santander Bank customer accounts. CW-1 recalled meeting CW-2 in a car, along with CC-1, CC-2, ILOBA, and another individual to coordinate the first set of transactions. CW-1 stated that after the transactions were completed, CC-1 gave him approximately $8,000 in cash to split with CW-2 and that CW-1 and CW-2 split the money equally.

c.  According to CW-1, this same group of individuals coordinated another fraudulent transaction with CW-2's assistance the next day, and CC-1 again gave CW-1 approximately $8,000 in cash, which CW-1 split evenly with CW-2.[3]

d.  After the transactions involving CW-2, CW-1 and ILOBA were paid to drive "runners" to various banks to make fraudulent withdrawals.

e.  At CC-1's direction, CW-1 recruited CW-3 to open business bank accounts. After agreeing to participate in the scheme, CW-3 sent CW-1 a photo of himself, which CW-1 sent to CC-1 via WhatsApp. Later, CC-1 sent ILOBA fake IDs bearing CW-3's photo, which CW-1 picked up from ILOBA and gave to CW-3. CW-3 then opened business accounts at various banks using false identities. CW-1 recalled accompanying CW-3 to a TD Bank branch in West Roxbury, where CW-3 opened an account in the name of IMS Intellibound. CW-1 further recalled giving CW-3 one of the checks that CC-2 had withdrawn from a Santander Bank customer's account with CW-2's assistance, which was made payable to IMS Intellibound, for CW-3 to deposit into the IMS Intellibound account he had opened at TD Bank.

f.  ILOBA told CW-1 that ILOBA's girlfriend, CLOUGH, also worked for CC-1. CW-1 recalled an instance in which CLOUGH was upset because she had been arrested at a bank after attempting to perform account activity using a false identity at the direction of CC-1 and ILOBA.[4]

---

[3] CW-1 stated that CC-1 later gave him another $7,000 and promised to pay him an additional $18,000 for his role in facilitating these transactions (but never did so).

[4] Based on CLOUGH's criminal history, I believe this relates to her November 2017 arrest by the Saugus Police Department, as discussed in footnote 15 below. That was CLOUGH's only arrest in 2017, and her most recent arrest prior to that was in 2011.

23.     CW-3 also acknowledged his knowing involvement in the scheme. In interviews with investigators, CW-3 provided the following information:

a.   CW-3 became acquainted with ILOBA and CW-1 while working at a Dunkin' Donuts where they were regular customers. After becoming friends with CW-1, CW-3 agreed to open business bank accounts using false identities.

b.   In or around December 2016 or January 2017, CW-1 asked CW-3 to send a picture of himself to CW-1 via WhatsApp so that they could create IDs with CW-3's photo but someone else's name. CW-1 later brought CW-3 a fake California ID, social security card, and debit card bearing Victim 3's name, along with IRS business forms and incorporation documents.

c.   CW-1 accompanied CW-3 to a TD Bank branch in West Roxbury to open his first account in the name of a business – the name of which CW-3 could not initially recall[5] – using the fake identification documents in Victim 3's name. Later, CW-1 accompanied CW-3 to a TD Bank branch in Cambridge to deposit a $175,000 cashier's check into the account. A day or two later, CW-1 drove CW-3 to three different TD Bank branches to withdraw cash. The three withdrawals were in the approximate amounts of $9,500, $9,500, and $9,700. CW-3 kept approximately $1,300 as payment for his role in the scheme.

---

[5] When later shown IRS and Massachusetts Articles of Organization records for IMS Intellibound, CW-3 confirmed that this was the business name under which he first opened accounts.

d.  CW-3 also opened accounts using a different false identity and in the name of another business called Haumann Construction. CW-3 would then get checks made out to other businesses or other aliases to move money around.

e.  CW-3 recalled accompanying CW-1 to a hotel to deliver cash to CC-1. ILOBA was present at the meeting. Also present was an individual who CW-3 understood to be the person who went into the banks – including the Santander Bank Uphams Corner Branch – to get checks out.

f.  CW-3 frequently observed FaceTime calls between CW-1 and ILOBA. CW-3 heard the two talking about bank accounts, how much money was in the accounts, and when money made it into the accounts. They also discussed how they were coordinating with CC-1. CW-1 told CW-3 that ILOBA had introduced him to CC-1 and that CC-1 was the one who provided the fake IDs.

g.  While waiting in lockup after being arrested for his involvement in the scheme, CW-3 spoke with two other individuals who had also been arrested, including Dave Guillaume, who is discussed further below. CW-3 told Guillaume that CW-1 and ILOBA had used him to open bank accounts. Guillaume said that he knew CW-1 and ILOBA and that they had used him and the third individual who had been arrested for the same thing.

**Bank of America Transactions (Kendall Square Branch)**

24.     Based on my investigation – including my review of bank records and surveillance photos, an interview with the victim set forth below, and information provided by other law enforcement officers – I am aware that, as part of the fraud scheme described herein, from in or about December 2017 through in or about March 2018, ILOBA agreed with others to fraudulently

obtain money from a checking account controlled by Victim 4, an individual customer of Bank of America, and launder the proceeds of the fraud through accounts at other financial institutions in the names of fictitious business entities.

25.     On or about December 20, 2017, a co-conspirator named Dave Guillaume[6] opened a business checking account, ending in 5794 ("CITIZENS-5794"), at a Citizens Bank branch in Somerville, Massachusetts. Guillaume opened the account in the name of a fictitious business entity, Lincorn Foresight Construction Inc. ("Lincorn"), using the alias James Jackson.

26.     On or about March 1, 2018, an unidentified co-conspirator, CC-3, entered a Bank of America branch in the Kendall Square area of Cambridge, Massachusetts. CC-3 approached a bank teller, identified himself as Victim 4, and presented the teller with a fraudulent identification document in Victim 4's name. CC-3 requested an official bank check, in the amount of $230,000 made payable to "Lincorn Forsight [*sic*] Construction LLC," drawn on Victim 4's checking account ending in 1664 ("BOA-1664"). CC-3 also requested a cash withdrawal of $7,500 from the BOA-1664 account. The bank teller processed the requested transactions. To my knowledge, the teller was not aware of the fraudulent nature of the transactions.

27.     Victim 4's spouse was interviewed and confirmed that the above-described transactions were fraudulent and that neither she nor her husband had authorized the transactions.

28.     On or about March 1, 2018, CC-3 went to a Citizens Bank branch in the Lechmere Square area of Cambridge, Massachusetts and deposited the $230,000 official bank check into the CITIZENS-5794 account that Guillaume had opened in the name of Lincorn.

---

[6] In October 2019, Guillaume was charged in a one-count indictment with conspiracy to commit money laundering, in violation of Title 18, United States Code, Section 1956(h), for conduct similar and related to that described herein. *See United States v. Lindsley J. Georges and Dave Guillaume*, No. 19-cr-10408-ADB (D. Mass.). The case remains pending.

29.     Based on information provided by Cambridge police officers, who spoke with bank personnel, I am aware that on or about March 6, 2018, Guillaume entered the same Citizens Bank branch in Cambridge and asked a teller about the status of the $230,000 deposit into CITIZENS-5794. The teller, who had previously been advised of the fraudulent nature of the check, asked Guillaume for identification. Guillaume presented the teller with a California driver's license in the name of James Jackson.[7] The teller recognized the driver's license as fraudulent and asked Guillaume to take a seat in the waiting area. The teller then went to a back room to call the police, but Guillaume left the branch prior the police's arrival, leaving the driver's license behind.

30.     Based on information provided by Cambridge police, I am aware that on or about March 7, 2018, Guillaume returned to the same Citizens Bank branch and again inquired about the status of the $230,000 deposit into CITIZENS-5794. Guillaume also asked about the driver's license he had left behind the previous day. Bank personnel alerted the Cambridge Police Department that an individual who had inquired about a fraudulent check and presented fraudulent identification the previous day was currently in the bank again inquiring about the status of the check. Shortly thereafter, officers arrived and arrested Guillaume outside the branch.

31.     Based on a subsequent search of Guillaume's cellular telephone, pursuant to a written consent-to-search obtained by Cambridge police officers at the time of his arrest, I am aware that ILOBA directed Guillaume to return to the Citizens Bank branch to retrieve the driver's license he had left behind. The following are excerpts from a text message exchange between ILOBA and Guillaume on March 7, 2018, prior to Guillaume's arrest:

---

[7] The identifying information on the driver's license does not correspond to a real individual with the name James Jackson.

ILOBA: "*Call me ASAP bro*"

ILOBA: "*We need to go back and collect the piece*"[8]

ILOBA: "*Just the piece.*"

Guillaume: "*I'll collect it*"

Guillaume: "*They cancelled banner seltzer*"[9]

ILOBA: "*How I just called t*"

Guillaume: "*They sent a check bro with the balance*"

Guillaume: [Image of Citizens Bank official check dated February 28, 2018 in the amount of $900 made payable to Banner Seil Seltzer Reair Corp.]

ILOBA: "*It's a Lynn account that's why*"

Guillaume: "*What's wrong with Lynn accounts*"

ILOBA: "*It doesn't have anything to do with Lincoln [*sic*]*[10]"

Guillaume: "*Yea I know that*"

ILOBA: "*They closed it before the 28*"

Guillaume: "*I'm just letting you know*"

ILOBA: "*Of course*"

ILOBA: "*Send pictures to WhatsApp bro*"

ILOBA: "*Not here please*"

Guillaume: "*Iight*"

ILOBA: "*We gotta get the piece back because they turned it back on*"

Guillaume: "*Iight*"

Guillaume: "*We getting it today*"

ILOBA: "*Ok*"

ILOBA: "*What time are you going*"

ILOBA: "*Has to be very early*"

Guillaume: "*10*"

ILOBA: "*Tell them that you had a work emergency and you needed to go but you forgot they still had the ID with them. It [*sic*] you called back and try said that it was at the tellers drawer*"

ILOBA: "*You called multiple times asking for the piece to be kept but they told you it's in their tellers drawer.*"

ILOBA: "*The same teller that attended tonyih*"

Guillaume: "*Iight*"

---

[8] Based on my training and experience, I understand "the piece" to be a reference to the fraudulent driver's license.

[9] Based on my investigation, I am aware that Guillaume opened business accounts at TD Bank and Citizens Bank in the name Banner Seil Seltzer Reair Corp. ("Banner"), a fictitious entity, using another alias. The TD Bank account was frozen as of January 17, 2018. Thereafter, Citizens Bank closed the Banner account and issued a check for the account balance to the account holder. Accordingly, I believe that in this portion of the text message exchange, Guillaume is updating ILOBA that Citizens Bank had closed the account.

[10] I understand this to be a reference to Lincorn.

13

ILOBA: "*She supposedly kept it in her drawer*"

ILOBA: "*Meet with her and talk to her privately and ask her for it. If it takes more than 2 mins. You are out of there s*"

Guillaume: "*light*"

ILOBA: "*You can't wait. No have no time. You just want the ID and go*"

Guillaume: "*light*"

ILOBA: "*I'm panicking bro*"

ILOBA: "*Nobody is picking up*"

ILOBA: "*Please tell me everything is ok*"

### TD Bank Transactions (Peabody Branch)

32.     Based on my investigation – including my review of bank records and surveillance photos, information provided by a cooperating witness, CW-4,[11] and interviews with the victims set forth below – I am aware that, as a further part of the fraud scheme described herein, between approximately August 2017 and October 2017, ILOBA and CLOUGH agreed with each other and with others to fraudulently obtain money from home equity line of credit ("HELOC") accounts controlled by Victim 5 and Victim 6, both individual customers of TD Bank, and launder the proceeds of the scheme through accounts opened at other financial institutions in the names of fictitious business entities.

33.     In or about August 2017, ILOBA and CLOUGH recruited CW-4, who was then employed as a teller at a TD Bank branch located in Peabody, Massachusetts (the "Peabody Branch"), to facilitate fraudulent transactions in TD Bank accounts.

---

[11] CW-4 has pleaded guilty in the United States District Court for the District of Massachusetts to the charge of conspiracy to commit bank fraud, in violation of Title 18, United States Code, Section 1349. CW-4 has entered into a cooperation agreement with the government in the hope of obtaining leniency at sentencing. Information provided by CW-4 has been corroborated by, among other things, bank records and surveillance photos and text messages.

In addition to the above-referenced charges, CW-4's criminal history includes convictions for attempted larceny, malicious destruction of property, negligent operation of a motor vehicle, and assault and battery with a dangerous weapon (stun gun).

34.     On or about September 3, 2017, an unidentified co-conspirator, CC-4, entered the Peabody Branch, approached CW-4, falsely identified himself as Victim 5, and presented CW-4 with a fraudulent identification document in Victim 5's name. CC-4 requested three official bank checks – one for $7,000, a second for $92,000, and a third for $40,000 – drawn on Victim 5's HELOC account ending in 4367 ("TD-4367"). CC-4 also requested a cash withdrawal of $9,700 from the TD-4367 account. CW-4 facilitated the requested transactions, knowing that the identification document in Victim 5's name was fraudulent.

35.     On or about September 13, 2017, CLOUGH registered as a customer at a PLS Check Cashing Store ("PLS")[12] in Medford, Massachusetts. PLS records show that CLOUGH registered using the alias Laurence Williams and presented a fraudulent Pennsylvania driver's license bearing that name, the social security number of another individual,[13] and the validly-issued driver's license number of a second individual, but a photo of CLOUGH. The PLS customer profile identifies Williams as a partial owner of a fictitious business entity, Maritime System Investment Inc. ("Maritime").

---

[12] Based on my training and experience, I am aware that PLS is a financial services business that allows customers to conduct financial transactions for a fee, such as the cashing of checks. Customers presenting a check to be cashed instantly receive the funds minus a percentage fee. In part because check cashing services are often used in connection with illegal activity, PLS generally requires customers to register and provide information for the creation of a customer profile. The customer profile typically includes a copy of a photo ID presented by the customer as well as a photo taken of the customer at the time of registration. When a customer presents a check to be cashed, PLS employees are supposed to request a photo ID from the customer and compare it to the ID retained on file and to compare the  photo of the customer taken on the date of registration with the person present at the time of the transaction.

[13] Based on information provided by the Social Security Administration, I am aware that the social security number appearing on this driver's license belonged to an individual – not named Laurence Williams – who was deceased at the time of the events described herein.

36.     On or about September 17, 2017, CC-4 returned to the Peabody Branch, approached CW-4, and again falsely identified himself as Victim 5. CC-4 requested three official bank checks – one for $90,000, a second for $8,000, and a third for $68,000 – drawn on TD-4367. CC-4 also requested a cash withdrawal of $9,000 from the TD-4367 account. CW-4 facilitated the requested transactions.

37.     As a further part of the scheme, on or about September 18, 2017, another unidentified co-conspirator, CC-5, entered the Peabody Branch, approached CW-4, falsely identified himself as Victim 6, another TD Bank customer, and produced a fraudulent identification document in Victim 6's name. CC-5 requested three official bank checks – one for $33,000, a second for $35,000, and a third for $55,000 – drawn on Victim 6's HELOC account ending in 0555 ("TD-0555"). The $35,000 check was made payable to Maritime. CW-4 facilitated the requested transactions, knowing that the identification document in Victim 6's name was fraudulent.

38.     On or about the same day (*i.e.*, September 18, 2017), the $35,000 check made payable to Maritime was cashed at the PLS location in Medford, under the customer profile registered by CLOUGH.[14] The name Laurence Williams was signed on the back of the check.[15]

---

[14] Based on my investigation, I am aware that Dave Guillaume worked as a manager at this PLS location at the time of the events described herein. Records show that, in that capacity, Guillaume was involved in processing transactions under the Laurence Williams customer profile registered by CLOUGH (although there is no documentary evidence of his involvement in this particular transaction).

[15] Based on my investigation, and as set forth further below, I believe that CLOUGH and ILOBA laundered other fraudulently obtained funds through accounts opened at Citizens Bank in the name of Maritime using the Laurence Williams alias.

Specifically, on or about June 24, 2017, an unidentified co-conspirator, CC-6, opened a business checking account and a business savings account in Maritime's name at a Citizens Bank branch in Lynn, Massachusetts, using a fraudulent Pennsylvania driver's license bearing the name

39.     On or about October 1, 2017, CC-4 returned to the Peabody Branch, approached CW-4, and again falsely identified himself as Victim 5 and presented CW-4 with a fraudulent identification document in Victim 5's name. CC-4 requested three official bank checks – one for $32,000, a second for $8,500, and a third for $9,500 – drawn on Victim 5's HELOC account ending in 7376 ("TD-7376").[16] CC-4 also requested a cash withdrawal of $9,200 from the TD-7376 account. CW-4 facilitated the requested transactions.

40.     Both Victim 5 and Victim 6 were interviewed and confirmed that neither they nor their spouses authorized the transactions described above.

---

Laurence Williams. Fraudulently obtained funds were later negotiated through at least one of these accounts.

First, on or about September 19, 2017, an unauthorized wire transfer in the amount of $135,956 was made from an individual's SunCoast Credit Union account to a Bank of America account in the name of Haumann Construction, Inc. ("Haumann"), the fictitious business entity referenced in paragraph 23(d) above. Surveillance photos show both CC-1 and CW-3 conducting ATM transactions out of this Haumann account.

Two days later, another unidentified co-conspirator deposited an official Bank of America check funded by the Haumann account, in the amount of $47,850 and made payable to Maritime, into one of the Citizens Bank accounts opened by CC-6. The name Laurence Williams was signed on the back of the check. Bank surveillance photos show that on or about November 1, 2017, ILOBA made three ATM withdrawals – each in the amount of $600, totaling $1,800 – from this Citizens Bank account.

Then, on or about November 25, 2017, funds from a TD Bank customer's HELOC account were used, without the customer's knowledge or authorization, to purchase an official bank check in the amount of $20,000 and made payable to Laurence Williams. The next day, CLOUGH went to a Citizens Bank branch in Saugus, Massachusetts and attempted to deposit the check into one of the accounts opened by CC-6, using the same driver's license she had used to register as a customer at PLS, along with a Citizens Bank debit card bearing the name Laurence Williams. The name Laurence Williams was signed on the back of the check. Based on information provided by Saugus police officers and Citizens Bank personnel, I am aware that Citizens Bank personnel became suspicious of CLOUGH and notified the Saugus Police Department. Officers arrived shortly thereafter and arrested CLOUGH. In connection with the arrest, officers seized the above-referenced driver's license and debit card, copies of which I have reviewed.

[16] TD-7376 was assigned to Victim 5 as a new account after TD-4367 was compromised.

41.     In interviews with investigators, CW-4 acknowledged that she knowingly facilitated the fraudulent transactions described above. CW-4 stated that she was recruited by CLOUGH, who was an acquaintance of hers, and ILOBA to facilitate the transactions, and that CLOUGH and ILOBA paid her somewhere between $25,000 and $60,000 for her role in the scheme. CW-4 further stated that she communicated with CLOUGH and ILOBA regarding how and when the fraudulent transactions would take place and that those communications took place in person and via phone calls and text messages. CW-4 provided the following additional information:[17]

   a. CW-4 became involved in the scheme in or around the summer of 2017 through her friend, CLOUGH, who she met via social media. CLOUGH was aware that CW-4 was having financial difficulties at the time and presented the scheme to her as a way of making extra money. CLOUGH said she had a friend who could help CW-4. CLOUGH then introduced CW-4 to her boyfriend, ILOBA.

   b. CW-4 met ILOBA for the first time in or around August 2017. CLOUGH was also present at this initial meeting, during which ILOBA and CLOUGH explained to CW-4 how the scheme worked. They explained that they wanted CW-4 to issue checks and process cash withdrawals from HELOC accounts. ILOBA explained that the checks drawn on the HELOC accounts would be deposited at other banks. CW-4 told ILOBA and CLOUGH that the check withdrawals needed to be below a certain amount to avoid the need for manager approval.

---

[17] CW-4 stated that her memory has been affected by chronic marijuana use.

c.  Based on what she was told by ILOBA, CW-4 believed that the HELOC accounts being accessed were created by other co-conspirators using aliases to launder money "from the street." CW-4 asked ILOBA if the accounts belonged to real people/bank customers and he said they did not.

d.  Prior to each set of fraudulent transactions described above, ILOBA and/or CLOUGH notified CW-4 that a runner would be coming into the Peabody Branch to make the withdrawals. ILOBA sent these individuals into the bank with fake IDs to request withdrawals of cashier's checks and cash.

e.  ILOBA told CW-4 that he was outside the Peabody Branch on at least one of the occasions when CW-4 facilitated fraudulent transactions.

f.  When CW-4 facilitated fraudulent transactions, ILOBA paid her in cash after she got out of work for the day. CLOUGH was present on at least one occasion when ILOBA paid CW-4.

g.  CLOUGH and ILOBA asked CW-4 to recruit other tellers to participate in the scheme. CW-4 initially refused but then attempted to recruit one of her co-workers, who was not interested in participating.

h.  At the time of interviews with law enforcement, CW-4 had both ILOBA and CLOUGH saved as contacts in her cell phone. CW-4 provided investigators with copies of text messages between her and CLOUGH from November 2017, at which point CW-4 was no longer working at TD Bank. On November 13, 2017, CLOUGH and CW-4 exchanged the following messages:

CLOUGH: "*Hey it's Em, call me when you can*"
CW-4: "*?*"
CLOUGH: "*It's about work.*"
CLOUGH: "*So whenever you are ready to go shopping just let me know okay.*"

CW-4: "*Got you mamas*"

CW-4 told investigators that "work" was a reference to conducting fraudulent transactions as part of the scheme and that "go[ing] shopping" meant sending someone into the bank to make the fraudulent withdrawals. On November 24, 2017, CLOUGH and CW-4 exchanged the following messages:

CLOUGH: "*Hey, can we do an emergency walk in?*"
CLOUGH: "*However much you are comfortable with*"
CLOUGH: "*Something decent*"
CW-4: "*Do 100 & take 9 cash*"
CLOUGH: "*Cool [OK emoji]*"

CW-4 told investigators that "do 100 & take 9 cash" meant the runner should withdraw $100,000 in checks and $9,000 in cash. CW-4 had previously discussed with ILOBA and CLOUGH that the cash withdrawals should be under $10,000 to avoid bank reporting requirements. The following is an excerpt of text messages exchanged by CLOUGH and CW-4 the next day (*i.e.*, November 25, 2017):

CW-4: "*No red hair , no older Dominican . Targets are [...] the young white girl & young Spanish girl.*"
CLOUGH: "*Got you boo*"
CW-4: "*Lmk when it's done I'll be in the area until 2*"

CW-4 told investigators that here she was explaining to CLOUGH which bank tellers working at the Peabody Branch she thought would process the planned transactions. CW-4 stated that none of these tellers had any knowledge of the scheme. Later the same day, CLOUGH and CW-4 exchanged the following text messages:

CLOUGH: "*We wasn't comfortable doing it today when is you [*sic*] friend going back?*"
CW-4: "*Monday*"
CLOUGH: "*Okay*"

The day after this exchange – Sunday, November 26, 2017 – CLOUGH and CW-4 exchanged the following text messages:

CW-4: *"Are we shopping tomorrow?"*
CLOUGH: *"Yes wtw* [what's the word]*"*
CW-4: *"Same thing , tall white boy that looks like Aaron Hernandez"*

CW-4 explained to investigators that the individual referenced in her message was the teller who she had approached about participating in the scheme. The day of the planned transactions, CLOUGH sent the following text message to CW-4: "Couldn't go shopping[.]" CW-4 does not believe that the planned transactions ever took place.

## CONCLUSION

42.    Based on my knowledge, training, and experience, and the facts set forth in this affidavit, I respectfully submit that there is probable cause to believe that ILOBA and CLOUGH conspired to commit bank fraud, in violation of Title 18, United States Code, Section 1349.

Respectfully submitted,

Dominic Gross
Special Agent
Federal Bureau of Investigation

Electronically subscribed and telephonically sworn to before me on March \_\_15\_\_, 2021

THE HON. DONALD L. CABELL
United States Magistrate Judge

21